UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PATRICIA PORTER,                    )
                                    )
        Plaintiff,                  )
                                    )
    vs.                             )    Case No. 4:11CV540 CDP
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying
Patricia Porter's application for disability insurance benefits under Title II of the
Social Security Act, 42 U.S.C. §§ 401 et seq.  Section 205(g) of the Act, 42 U.S.C.
§ 405(g), provides for judicial review of the Commissioner's final determination.
Porter alleges that she is disabled due to coronary artery disease, hypertension,
bilateral lower extremity disease, and anemia.  Because I find that the decision
denying benefits was not supported by substantial evidence, I will reverse the
decision of the Commissioner.

## Procedural History

Porter filed her application for benefits on July 23, 2007.  The claim was
initially denied on February 8, 2008.  On July 27, 2009, following a hearing, an

Administrative Law Judge denied Porter's claim.  On February 9, 2011, the

Appeals Council of the Social Security Administration denied Porter's request for

review.  Thus, the decision of the ALJ stands as the final decision of the

Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In her application for benefits, Porter stated that she was born in 1958 and

became disabled beginning on July 17, 2007 because she had a heart attack. She

listed her disabilities as heart problems and high blood pressure.  In the disability

function report filed in connection with her claim, Porter described her daily

routine as getting up, caring for herself, taking her medication, and then going for

a short walk.  She stated that she would then come home, fix breakfast, rest, watch

television, and take a nap.  After fixing herself lunch, Porter then watched more

television and spent time with her grandchildren.  Porter claimed that she then

prepared dinner and got ready for bed.  She stated that she could no longer work,

run errands, or go on social outings because of her disability, and that she had

anxiety and trouble sleeping because she was worried about finances.  She

reported memory loss and depression, and said that she avoided social situations

because she could not "relate to others."  Porter noted difficulties with lifting (only

- 2 -

five pounds), squatting, bending, standing, reaching, walking, climbing stairs, memory, completing tasks, and getting along with others.  She said that her husband was now responsible for bill paying and maintaining the household and property as a result of her condition.  Porter completed the function report on August 11, 2007.

On March 23, 2008, Porter updated her disability report.  In response to the question about how her illnesses affect her ability to care for her personal needs, Porter made the following statement:

> I'm able to complete my personal care needs.  However, I have to move more slowly.  I also have to take more breaks.  If I try to move too fast, I get short of breath.  Sometimes my arms get tired when styling my hair since I've had my heart attack.  I have difficulty getting out of the bathtub after soaking and relaxing.  I try not to bathe without someone being in my home with me.

When asked what changes have occurred in her daily activities since she last completed her disability report, Porter responded as follows:

> I'm able to do light household chores and my husband does most of the tasks.  While doing any chore around my home, I have to take frequent breaks and move slowly to avoid getting short of breath.  At times, I get chest/arm pain and tingling while attempting to do household chores.  My grandkids do the dishes.  My husband does the laundry, dusting, sweeping, vacuuming, mopping and yardwork.  My husband or daughter goes with me to grocery shopping to help me when needed.  I use the cart for support and I take frequent breaks.  I go shopping a couple times a month.  My husband does a majority of the cooking.

<u>Medical Records</u>

Porter was hospitalized at St. Louis University Hospital from May 6-10, 2007 for an ST-elevated myocardial infarction, hypercholesterolemia, mild acute renal failure, and right groin hematoma.  Her discharge diagnosis also included tobacco abuse.  According to her records, Porter went to the emergency room complaining of severe chest pain, numbness, and nausea and was admitted to the hospital until her pain "resolved spontaneously."  A cardiac catheterization revealed two-vessel coronary artery disease with left anterior descending artery having a 100% occlusion in the mid portion and the right coronary artery having a distal 50-60% stenosis.  Porter was also noted to have microcytic amenia.  Porter was discharged from the hospital with instructions to rest and not work until she obtained a release from her primary care physician.  She was also advised to quit smoking, eat a heart healthy diet, and get a repeat stress test in one month.

On July 18, 2007, Porter received a diagnostic left heart catheterization, which revealed: one vessel obstructive coronary artery disease with in-stent restenosis of the left anterior descending coronary artery stent; preserved left ventricular systolic function; normal left ventricular filling pressures; systemic hypertension; and successful percutaneous intervention with placement of a 3.0 x 28 mm Cypher drug eluding stent to treat in-stent restenosis in the mid-left

anterior descending coronary artery.  Twelve months of Plavix therapy was recommended.

On August 20, 2007, Porter was seen by Denise L. Janosik, M.D. for her cardiac rehabilitation evaluation.  Her chart noted that she received a Cypher drug-eluding stent on July 18, 2007 to treat her in-stent stenosis and was now doing well.  Porter denied any angina or exertional dyspnea.  Dr. Janosik reported that Porter's known risk factors for coronary artery disease included positive family history, history of hypertension, elevated cholesterol, and being a previous heavy smoker.  Porter's weight fluctuated, and she reported having trouble sleeping at night.  Porter denied having any GI symptoms, polyuria, polydipsia, hot or cold intolerance, arthritic pain, or depression.  Porter's lungs were clear, her heart had regular rate and rhythm with no murmur, her extremities were without edema, and her peripheral pulses were intact.  Dr. Janosik's impressions were coronary artery disease without angina and hyperlipidemia.  Porter was prescribed Zetia and ordered to continue cardiac rehabilitation.

On August 22, 2007, Porter was diagnosed with claudication and diminished lower extremity pulses.  On the same day, a cardiac rehabilitation nurse reported that Porter had completed 10 of her 26 cardiac rehabilitation sessions.  Porter stated that her prior complaints of foot cramps and a stiff neck

had been resolved.  Porter told the nurse that she did not believe she could return to her old job and that she was applying for disability benefits.

On September 11, 2007, a lower extremity vascular ultrasound by cardiologist Wajeehuddin Mohammed, M.D. revealed: a mildly abnormal ankle brachial index, with the right worse than left; abnormal pulse volume recording seen in bilateral lower extremity on the PVR study; and the presence of mild peripheral artery insufficiency in the right lower extremity.  Claudication was listed as a symptom.  No evidence of a pseudoaneurysm was detected in the right groin.  Dr. Mohammed advised Porter to obtain an "exercise ABI in order to evaluate for any significant reduction upon exercise."

On September 25, 2007, Porter saw Dr. Mohammed for an exercise ABI report.  Mohammed reported a "significant postexercise drop bilateral lower extremity upon exercise . . . [which] indicates most likely inflow disease bilaterally."  During her examination, Porter told Dr. Mohammed that she was "currently chest pain free."  Dr. Mohammed's overall impression of Porter was as follows:

> She had mildly abnormal ABIs at rest, but there was significant and dramatic postexercise drop in bilateral ABIs.  This is consistent with inflow disease probably at iliac artery level bilaterally.  With this in mind, I want to bring her back for aortogram with runoff with accessing the left groin because [her] symptoms are worse on the

right.  We are planning to schedule this in the outpatient lab next available.  As usual secondary to risk factor modification aggressive control of her risk factors recommended.

Porter saw Michael J. Lim, M.D. and Abhay Laddu, M.D. for a routine follow-up visit on October 3, 2007.  Since her last visit with them, she had seen Dr. Mohammed for claudication symptoms and an abnormal exercise ABI and was supposed to have undergone an aortogram with peripheral runoff to evaluate for peripheral arterial disease.  However, while she was getting prepared for the procedure, she was found to be anemic.  Therefore, Porter was given an upper endoscopy and colonoscopy instead.  The results of her upper endoscopy revealed grade I gastritis, so Porter was given an iron supplement and two units of red blood cells.  Porter reported an episodic "flutter-like" burning on the left side of her chest that occurs approximately two to three times per week, which she said was different from her prior myocardial infarction/anginal pain.  Porter also continued to complain of claudication symptoms.  The doctors made no changes to Porter's medications for coronary artery disease, but increased her blood pressure medication.  They also noted that Porter still needed to undergo testing for peripheral arterial disease.  The doctors concluded their examination of Porter with the following notation:

She continues to follow up in cardiac rehab.  Given the complexity of

her disease, which is complicated by anemia and likely peripheral
arterial disease that is as yet undiagnosed, we will need to arrange for
her to have short-term disability at least for the next three months
until all of this gets worked out.  We will plan on seeing her back
here in the clinic after her aortogram.

On October 26, 2007, Porter saw Dr. Mohammed for a renal angiography

and an abdominal aortogram.  Mohammed found significant left common iliac and

external iliac angiographic disease by angiography and pressure gradient, along

with right superficial femoral artery disease.  Mohammed reported that Porter

"will be returning for elective PTA and stenting of the left common iliac artery and

possible PTS of the right superficial femoral artery."

Porter was evaluated by Inna Park, M.D., for her disability claim on

November 14, 2007.  After examination, Dr. Park diagnosed her with hypertension

and known coronary artery disease with weekly symptoms of chest pain.  Porter

had no clubbing, cyanosis, or edema of her extremities, and she was able to get on

and off the examination table without difficulty.  Porter was able to walk on her

toes and heels and squat without difficulty and moved with apparent ease.  Park

observed no swelling, warmth, or tenderness of Porter's joints, and found her

range of motion to be within normal limits.

On a follow up visit on January 2, 2008, one of Porter's cardiologists

confirmed that she still had activity-limiting claudication and decreased pulse and

recommended that Porter schedule a peripheral intervention test with Dr. Mohammed.

On January 7, 2008, Porter saw primary care physician George Griffing, M.D. "for followup of her chronic medical problems and management of her prescription medication."  Dr. Griffing listed Porter's chronic conditions as coronary artery disease post stent July 2007, peripheral vascular disease, hypertension, anemia, renal insufficiency, and plantar fasciitis.  Dr. Griffing stated that Porter's heart disease was "stable," she had no peripheral vascular disease symptoms, her blood pressure was "excellent," her lipids were good, and that she had no problems with her anemia.  Dr. Griffing noted that Porter was complaining of plantar fasciitis symptoms in her right foot since she started walking in conjunction with her cardiac rehab therapy, but that "otherwise she is in her usual state of health."  Dr. Griffing's review of Porter's systems was "unremarkable." Porter's vital signs were normal, she was alert and oriented, with clear lungs and a regular heart rhythm.  Her abdomen was soft, and she had no clubbing, cyanosis, or edema in her extremities.  Because Dr. Griffing found some tenderness over Porter's plantar fascia, he prescribed ibuprofen and referred her to a podiatrist for plantar fasciitis.  Otherwise, Dr. Griffing's impression was that Porter's "coronary artery disease and peripheral vascular disease symptoms" were stable, her blood

pressure was good, and her lipids were excellent.

On January 15, 2008, Porter saw Dr. Mohammed for a follow-up visit.  In a letter to Dr. Lim, Dr. Mohammed stated that he began treating Porter in October 2007 for "lifestyle limiting claudication of bilateral lower extremities . . . ."  He also noted that the prior tests her performed were consistent with aortoiliac disease bilaterally.  Upon examination, Dr. Mohammed found a diminished pulse in Porter's bilateral femoral artery.  Dr. Mohammed summarized his overall impression and plan as follows:

> Porter . . . [has] significant history of coronary artery disease in the past with history of intervention in June 2007 in the context of a non-ST segment elevation myocardial infarction.  She also is found to have significant abnormal ABIs especially on exercise and symptoms of claudication.  She has basically Rutherford class III claudication.  At this time, she did have a workup of her anemia and that was found secondary to gastritis.  At this point, I would like to proceed with aortogram with runoff and possible intervention.

Dr. Mohammed performed the aortogram on January 21, 2008.  The results revealed "no significant inflow disease in the form of the iliac artery stenosis as he suspected on the ABI.  However, she does have infrapopliteal disease in the posterior tibial arteries bilaterally."  Dr. Mohammed recommended "conservative management including exercise therapy and better control of hypercholesterolemia and other risk factor modification . . . ."  Intravascular intervention was not

required.

The record also contains a physical residual functional capacity assessment from Nancy Dunlap, a medical consultant, on February 8, 2008.[1]  Ms. Dunlap lists Porter's primary diagnosis as coronary artery disease, her secondary diagnosis as peripheral vascular disease, and her other impairment as high blood pressure.  She found that Porter retained the ability to perform sedentary work and could not return to her past work as a certified nursing assistant "due to exertional level."  Dunlap found that "per vocational rule 201.19/20 there are other jobs claimant is capable of performing.  Jobs she can do include . . . government service . . . retail trade, . . . and recycling . . . ."  Dunlap found that Porter could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk about two hours in an eight hour work day, sit about six hours in an eight hour work day, but that she could only occasionally climb, stoop, kneel, crouch or crawl.[2]

On March 31, 2008, Porter was seen by Joseph Drago, D.P.M., a podiatrist, for foot pain.  She told Dr. Drago that she had "disabling and intermittent" foot pain for the past eight months.  Porter said the pain worsened when walking or

[1]Dunlap made her assessment by reviewing medical records and did not examine Porter.

[2]Porter's records were also reviewed by Robert Cottone, Ph.D., for a psychiatric review technique given Porter's allegations of depression on her claim form.  Dr. Cottone found no mental impairments, and Porter does not allege any mental impairments, so I will not discuss his findings in detail.

standing.  During examination, Dr. Drago observed that Porter's subtalar joint bilateral was excessively pronated and that both calcaneus were severely everted. After x-rays were taken, Dr. Drago diagnosed Porter with abnormal pronation and plantar fasciitis in both feet and recommended stretching exercises and functional orthotic devices in combination with her anti-inflammatory medication.

During her cardiology appointment on April 16, 2008, Porter complained of chest pain and burning during exertion.  She made similar complaints to Dr. Lim and Dr. Laddau again on April 30, 2008.  They noted that her chest pain apparently improved since increasing her dosage of amlodipine and that her stress test was negative for ischemia.  Upon examination, the doctors found a regular cardiac rate and rhythm with no jugular venous distention or edema in the extremities.  Porter's doctors laid out the following plan:

> [A]t this time given a normal functional study and improved symptoms on increased dose of amlodipine, we will continue her on aggressive medical therapy for her coronary artery disease . . . .

Porter began seeing Ganesh Kudva, M.D., a hematologist, on February 12, 2009, for anemia.  Porter reported "occasional fatigue but no other symptoms." Porter's examination was otherwise normal. Dr. Kudva ordered blood tests and treatment with medication.  Porter's blood test revealed hematocrit of 28.2.

<u>Testimony</u>

- 12 -

A hearing before an ALJ was held on Porter's disability claim on April 22, 2009.  Porter testified and was represented by a non-attorney representative.[3] Porter told the ALJ that she was 50 years old and had an eleventh grade education. She was trying to get her GED so that she could get a different job "like secretarial work." She previously worked as a certified nursing assistant, which required her to lift patients, to stand and walk constantly, and to sit only during lunch breaks. Porter testified that she stopped working after she had a heart attack in May 2007. She had stents put in, but they had to replace them in July 2007.  She then developed problems with her feet hurting.  An orthopedist gave her some wraps for her feet to help alleviate the pain.  Porter said she experienced fatigue from her heart attack and anemia.  She testified that she now forgets things, such as leaving the stove on, so her husband or her granddaughter do most of the cooking.  Porter said she cooked about three times in the last month.  She said that she is too tired to clean the floors, do laundry, or climb stairs.  Porter goes to the grocery store with her husband, but cannot go alone.  She does not drive.  Porter testified that her cardiologist Dr. Laddau told her not to lift more than ten pounds.  She sees her

_____

[3]Defendant's allegation that Porter was represented by counsel in incorrect.  Although the first page of the hearing transcript incorrectly identifies Mr. Edwards as "attorney for claimant," the ALJ's decisions and the administrative record (Tr. 79) both make clear that he is not an attorney.

cardiologist about once every six months.

Porter testified that during the day she watches television, reads a book, or naps.  Porter usually takes two naps a day and sleeps from twenty minutes to two hours at a time.  Porter attends church twice a month now instead of every Thursday and Sunday like she used to before her heart attack.  Porter socializes with family if they come to visit her and talks on the phone.  Porter said her legs hurt when she walks more than half a block and she has problems lifting things more than five pounds.

The ALJ asked Porter no questions but left the record open for two weeks to allow her to submit a disability evaluation from her treating physician.  However, no additional information was provided to the ALJ.  The record reveals a note on May 13, 2008 from "Dr. G's" office,[4] which says that Dr. G. informed Porter that she "needs to be seen by a [physical therapist] or disability physician who has capability to assess skills with ability . . . Patient informed Dr. G. unable to complete form . . . ."

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Gowell

---

[4]It appears that "Dr. G." may be Dr. Griffing.

v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a

preponderance, but is enough so that a reasonable mind would find it adequate to

support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.

2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, id., or

because the court would have decided the case differently.  Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it."  Singh v. Apfel, 222 F.3d 448, 451

(8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.

1999)).  Where the Commissioner's findings represent one of two inconsistent

conclusions that may reasonably be drawn from the evidence, however, those

findings are supported by substantial evidence.  Pearsall v. Massanari, 274 F.3d

1211, 1217 (8th Cir. 2001) (internal citation omitted).

    To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

    (1) the credibility findings made by the Administrative Law Judge;

    (2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment

which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See

e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the

subjective complaints, the ALJ is required to consider the factors set out by

Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> the claimant's prior work record, and observations by third
> parties and treating and examining physicians relating to such
> matters as: (1) the claimant's daily activities; (2) the duration,
> frequency and intensity of the pain; (3) precipitating and
> aggravating factors; (4) dosage, effectiveness and side effects
> of medication; [and] (5) functional restrictions.

Id. at 1322.  When an ALJ explicitly finds that the claimant's testimony is not

credible and gives good reasons for the findings, the court will usually defer to the

ALJ's finding.  Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ

retains the responsibility of developing a full and fair record in the non-adversarial

administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir.

2002).

## The ALJ's Findings

The ALJ denied Porter's claim for benefits in a written decision dated July

27, 2009. The ALJ found that Porter suffered from severe impairments of coronary

artery disease, hypertension, bilateral lower extremity infrapopliteal disease, and

anemia, but that these impairments or combination of impairments did not meet or

medically equal one of the listed impairments.   The ALJ then concluded that

Porter had the residual functional capacity to perform a full range of light work, which is defined as lifting or carrying no more than 20 pounds occasionally and 10 pounds frequently and standing or walking no more than six hours in an eight hour workday.  In reaching this conclusion, the ALJ found that Porter's impairments imposed disabling symptoms and limitations from July 17, 2007 through January 6, 2008, but that the evidence supported a finding that Porter was able to engage in light work starting January 7, 2008.

He concluded that Porter's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  The ALJ found that "the claimant is able to essentially live and function independently, perform light household chores, go grocery shopping, and drive an automobile."  In addition, the ALJ stated that "[s]ince January 7, 2008, no physician, treating or otherwise, has ever placed any specific long term work-related restrictions upon the claimant's activities more restrictive than found in this hearing decision or expressed an opinion that the claimant is disabled."  He concluded that, "[t]o the extent the claimant's daily activities are restricted, they appear restricted mainly as a matter of choice, rather than any apparent medical prescription."

The ALJ determined that Porter required only "minimal or conservative treatment since January 7, 2008," which he found inconsistent with allegations of

a disabling impairment.  "There is no evidence of record that the claimant's prescribed medication is not generally effective when taken as prescribed or that it imposes significant adverse side effects."  The ALJ also found that "[t]here is no evidence that the claimant requires the use of prescribed orthotic or assistive devices."

In reviewing Porter's medical history, the ALJ decided that Porter's hypertension and anemia were treated and controlled with medication, and that Porter's cardiac examinations and diagnostic testing since January 7, 2008 were "essentially unremarkable."  As for Porter's bilateral lower extremity infrapopliteal disease, the ALJ similarly concluded that it was "treated and controlled with conservative therapy."   Because Porter is 5'4" tall with a weight between 220 and 225 pounds, the ALJ found that she had a "medically determinable and diagnosed obesity."  However, the ALJ found no substantial limitations with mobility or stamina resulting from Porter's obesity, nor did he believe that it "significantly exacerbate[d]" her other medical conditions.  Porter had a normal gait and was able to ambulate independently with a normal range of motion.  The ALJ also observed that Porter was in no obvious physical discomfort during the hearing, and she presented no corroborating witness testimony to support her allegations of disability.

The ALJ gave "great weight" to the opinion of Dr. Laddau, Porter's treating cardiologist, who indicated that she was disabled for a three-month period from October to December 2007.  He found that Dr. Laddau's opinions were supported by the clinical signs, symptoms, and findings in the record, as well as by Dr. Griffing's January 7, 2008 examination.  The ALJ afforded no weight to the opinion of Nancy Dunlap, who decided that Porter was limited to sedentary work, because it was not considered to be a medical source opinion under the regulations.  Therefore, the ALJ found that "the objective medical evidence of record supports a finding that since January 7, 2008, the claimant has impairments that impose symptoms and limitations that physically preclude the claimant from performing more than light work activity."

The ALJ concluded that Porter was unable to perform her past relevant work.  However, he found that the transferability of Porter's job skills was not material to his determination of disability because the Medical-Vocational Guidelines (Guidelines) mandated a finding of "not disabled."  In this case, the ALJ applied the Guidelines because he found that she could perform all the exertional demands of light work and had no non-exertional impairments.  Therefore, the ALJ held that Porter was not disabled under Medical-Vocational Rule 202.11, 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 2, "based on a

residual functional capacity for the full range of light work, considering the claimant's age, education, and work experience . . . ." This appeal followed.

## Discussion

Porter first argues that the ALJ erred in applying the Guidelines because she suffers from the non-exertional impairments of hypertension, obesity, pain, fatigue, coronary artery disease, bilateral lower extremity infrapopliteal disease, and anemia.  Nonexertional limitations are "those that affect a claimant's ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing, or pulling." Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2000) (internal quotation marks and citations omitted).  Hypertension, obesity, pain, and atherosclerotic heart disease are significant nonexertional impairments. Evans v. Chater, 84 F.3d 1054, 1056 (8th Cir. 1996).  Where a claimant has a nonexertional impairment, the ALJ may not exclusively rely on the vocational guidelines to determine disability but must also consider the testimony of a vocational expert. Haley v. Massanari, 258 F.3d 742, 747-48 (8th Cir. 2001).  However, the ALJ may rely exclusively on the guidelines even though there are nonexertional impairments "if the ALJ finds, and the record supports the finding, that the nonexertional impairments do not significantly diminish the claimant's RFC to perform the full range of activities listed in the

- 22 -

guidelines." <u>Draper v. Barnhart</u>, 425 F.3d 1127, 1132 (8th Cir. 2005) (quoting

<u>Reed v. Sullivan</u>, 988 F.2d 812, 816 (8th Cir. 1993)).  "In this context, significant

refers to whether the claimant's nonexertional impairment or impairments

preclude the claimant from engaging in the full range of activities listed in the

Guidelines . . . [I]solated occurrences will not preclude the use of the Guidelines,

however persistent nonexertional impairments which prevent the claimant from

engaging in the full range of activities listed in the Guidelines will preclude the

use of the Guidelines to direct a conclusion of disabled or not disabled." <u>Lucy v.</u>

<u>Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997) (internal quotation marks and citation

omitted).

      Here, the ALJ determined that Porter's "allegation that her impairments,

either singly or in combination, produce symptoms and limitations of a severity to

prevent all sustained work activity since January 7, 2008 [was] not credible."  In

doing so, the ALJ considered Porter's obesity but found that it did not impose

substantial limitations.  He also found no evidence of severe, chronic pain, and

observed that Porter "did not appear to be in any obvious credible physical

discomfort during the course of the scheduled hearing."  The ALJ noted that

Porter's cardiac examinations were "essentially unremarkable" since January 7,

2008, and that her hypertension and anemia were treated and controlled with

medication.  However, the ALJ did not consider Porter's persistent fatigue from

her cardiac problems and anemia as a nonexertional impairment.  See Levally v.

Massanari, 11 Fed. Appx. 695, 697 (8th Cir. 2001) ("[F]atigue . . . can cause

nonexertional limitations").  Porter listed fatigue as a limitation on her function

reports and testified about it during her hearing.  She told the ALJ that she forgets

things now and is too tired to clean the floors, do laundry, climb stairs, or grocery

shop without help.  She also testified that she takes two naps a day, for sometimes

as long as two hours at a time.  In her disability report, Porter stated that she gets

tired when performing basic personal hygiene tasks, such as styling her hair or

getting out of the bathtub, and that she has to take frequent breaks.  Porter's

complaints are corroborated by her reports to Dr. Kudva, her hematologist, and her

blood work, which shows low hematocrit[5] levels even as late as 2009 and while on

medication.  See Porter v. Apfel, 218 F.3d 844, 848 (8th Cir. 2000) (low

hematocrit lab values support claimant's assertion of fatigue and pain from

anemia).  Porter also complained of memory loss, which is a nonexertional

limitation that reduces a person's ability to work.  20 C.F.R. § 404.1569a(c)(1).

Despite this evidence in the record, the ALJ does not even address  these

---

[5]"Hematocrit level is the volume of red blood cells in a given volume of blood."
Fresenius Medical Care v. United States, 526 F.3d 372, 375 n.2 (8th Cir. 2008) (internal citation
omitted).

significant nonexertional limitations in his analysis.

Because of Porter's nonexertional limitations, the ALJ erred by determining that Porter could engage in the full range of light work without consulting the testimony of a vocational expert.  The ALJ's findings concerning Porter's residual functional capacity are not supported by substantial evidence because they do not consider the impact of all Porter's nonexertional impairments.  "[T]o find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world . . . The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity."  Draper, 425 F.3d at 1131 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).  Here, the ALJ's decision is not supported by substantial evidence on the whole record because the ALJ improperly applied the guidelines to direct a conclusion that Porter was not disabled without consulting a vocational expert in light of her significant nonexertional impairments.  Remand is therefore required.  See Beckley v. Apfel, 152 F.3d 1056, 1060 (8th Cir. 1998) (ALJ erred by failing to obtain vocational expert testimony as to effects of nonexertional impairments on claimant's residual functional capacity even though nonexertional

impairments may not be severe enough to be disabling); <u>Cline v. Sullivan</u>, 939

F.2d 560, 569 (8th Cir. 1991) ("When the Secretary erroneously concludes that a

claimant's allegations of pain are not credible and denies benefits based upon the

medical-vocational guidelines, remand for further proceedings to more fully

develop the record or for procuring expert vocational testimony is generally

appropriate.").

On remand the ALJ should consider all of the relevant evidence in making a

determination of the severity of Porter's impairments and her residual functional

capacity, including an evaluation of any additional evidence, testing or

consultative examinations that may be required. Additional evidence may be

particularly helpful here because Porter was not represented by an attorney during

the administrative process, Porter's non-attorney advocate failed to provide the

ALJ with the promised disability evaluation from her treating physician, and

Porter's treating physician indicated that he was unable to complete the disability

form because he lacked the capability to assess skills with ability.  Now that Porter

is represented by counsel, presumably counsel can work with the ALJ to provide

the requested evaluation and whatever additional information is necessary for

Porter's disability determination.  A physician's opinion could assist the ALJ in

his determination of residual functional capacity here, where the only physical

residual functional capacity assessment was performed by a non-medical, non-examining consultant whose opinion differed from that of the ALJ's.  As always, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand, 302 F.3d at 838

### Conclusion

Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner for a consideration of Porter's claim in light of all medical records on file and development of any additional facts as needed.  The Commissioner should reevaluate Porter's impairments and order additional testing or consultative examinations, if necessary, assess a residual functional capacity consistent with the medical evidence, and obtain vocational expert testimony to determine whether Porter is capable of performing work in the national economy with her limitations. Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order.  See Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate Judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 11th day of September, 2012.